## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| GUIDEONE ELITE INSURANCE COMPANY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 05-4162 |
| DIOCESE OF THE NORTHEAST AND MID-ATLANTIC OF THE REFORMED EPISCOPAL CHURCH, | : | |
| Defendant. | : | |
| CHRIST MEMORIAL REFORMED EPISCOPAL CHURCH and TRUSTEES OF THE SUSTENATION FUND OF THE GENERAL COUNCIL OF THE REFORMED CHURCH, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 05-4321 |
| GUIDEONE ELITE INSURANCE COMPANY, | : | |
| Defendant. | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                  **MARCH 23, 2006**

On August 3, 2004, Christ Memorial Reformed Episcopal Church's ("the Church")

steeple collapsed.  The Church and its insurance carrier, Guideone Elite Insurance Company

("GuideOne"), sued each other over whether the insurance policy covered the steeple's collapse.

In the first lawsuit, GuideOne sought a declaration that the Church parties[1] are not entitled to

---

[1] In addition to the Church, the Church parties include the Diocese of the Northeast and Mid-Atlantic of the Reformed Episcopal Church ("Diocese") and the Trustees of the Sustenation Fund of the General Council of the Reformed Episcopal Church ("Trustees") (collectively "the Church parties").

insurance coverage for the collapse.  In the second action, the Church parties sought a finding

that they are entitled to insurance coverage for the collapse, as well as a finding that GuideOne

acted in bad faith contrary to the provisions of Pennsylvania's bad faith statute, 42 Pa. C.S.A. §

8371.[2]

Presently before me are the parties' cross-motions for summary judgment on the issue of

insurance coverage.[3]  For the following reasons, I shall deny both parties cross-motions for

summary judgment on the insurance coverage issues.

## I.      RELEVANT BACKGROUND

Construction on the Church's 171 foot steeple was completed in or around 1887.  By the

time it fell on August 3, 2004, the Church's steeple had deteriorated.  Although the history of the

steeple's deterioration is described below, the legal issue in this case comes down to one factual

disagreement - whether lightning caused the steeple to fall or whether the steeple collapsed on its

own.

### A.      The Church Steeple's Recent History

As early as 1983, there were indications that the steeple had developed structural

problems.  In 1983, the Church formed a Tower Repair Committee chaired by Reverend Robert

N. McIntyre.  The Church's Tower Repair Committee commissioned Zenith Engineers, Inc. to

conduct an inspection of the church tower to determine if repairs were possible.  On April 12,

1983, Charles F. Kaine, P.E. reported that "most of the cracking and damage to the stone work is

---

[2] Subsequently, the parties reached a settlement on the Church parties' bad faith claim.  The Church
parties' bad faith claim is, therefore, moot.

[3] The Church parties also moved to strike certain portions of GuideOne's expert report.  On March 15,
2006, I denied the "Church Parties' Motion to Strike Portions of Guideone's Expert Report" (Doc. No. 21) without
prejudice.

concentrated in approximately one lift of the piers on the southeast corner.  The two exterior piers in this area are cracking and crumbling, with parts of the piers separating." (GuideOne's Summ. J. Mot. ("GuideOne's Mot.), at 14).  Kaine recommended that portions of the tower be taken down and rebuilt and that an engineering study be commissioned.

In response to the Kaine report, the Church requested an engineering survey conducted by Kaine and contractors specializing in church stonework.  On June 6, 1983, Kaine reported that it would cost $50,000 to repair the structural and cosmetic damage to the tower.  The work included rebuilding portions of the piers, installing steel tension rods in order to anchor walls and replacing deteriorated stone.

In the Spring of 1987, the Church commissioned a building survey by architects Cope, Lippincot, and Slifer.  The overall survey of the church structures found that it needed between $1.7 million and $2.2 million in repairs.  The report indicates "this is a substantial building complex, well built originally, but now in need of attention, some of which is more urgent than others." (GuideOne's Mot., at 15).

In 1989 Reverend Geoffrey Hubler commissioned a restoration assessment through architects Thomas and Newswanger.  Thomas and Newswanger provided a survey of the facility including aesthetics, structure, roofing, and mechanical plants.  The final Thomas and Newswanger report, dated August 25, 1989, noted that there was a vertical crack in the interior of the south wall adjacent to the southeast tower corner that extended through the stone and was approximately 7 feet high.  Another crack was noted on the exterior west wall.  The fissure was also noted to be through the stone.  The overall report starts its description of tower masonry by saying "[t]he masonry problems associated with the tower are not new." (Id.).  Under the

Recommendations and Masonry Section, the architects suggested monitoring the system to determine future movement of the tower.

In conjunction with its survey, Thomas and Newswanger retained consulting structural engineers, Ortega Consulting. Ortega's Summary and Recommendations state as follows:

> The tower has a structural defect which the tie-rods, installed several years ago, do not appear to have completed corrected. The vertical crack we found in the southeast corner of the tower was fresh enough to indicate recent movement. Any failure of the tower would likely be sudden and certainly catastrophic, so it is essential that a thorough engineering survey of the tower be done of both the interior and exterior faces of the walls from grade to peak of roof as soon as possible. It is likely that it will be necessary to strengthen the tower with additional new stainless tie-rods. At the very least an attempt should be made to start monitoring the existing crack so as to be aware of any changes in its width and length.

(Id.).

During their inspection of the tower on three occasions in the Spring of 1989, Ortega Engineers were unable to access high reaches of the tower for safety reasons. In the preliminary review of the masonry, the Ortega Engineers noted that they observed "several serious, potentially dangerous problems" and that there appeared to be "active deterioration process and there are several features of the building which have the potential for catastrophic failure." (Id. at 16).

The Ortega assessment of the tower was that additional steel rod supporting the walls were ineffective and "repointing," filling gaps in a structure with mortar, had been of poor quality. Vertical cracks were seen as were other features that indicated developments in sizeable stresses in the masonry. The engineer concludes as follows:

> This is a condition which needs professional attention as soon as possible and may require the installation of more elaborate reinforcement than what is now in place.

> At the very least, it would be prudent to initiate a monitoring program to measure the size and extent of the cracks on a regular basis.

(GuideOne's Mot., at 16).

In May of 1993, the Church sought a proposal from Masonry Preservation Group for some limited repointing at Benson Hall and the south tower. The proposal notes that stone had fallen off the south tower. In June of 1993, Philadelphia Historic Preservation Corporation evaluated the Church and reported to Reverend Hubler that the need for masonry repair "appeared urgent." (Id.). The report continued to suggest the monitoring system that had been recommended in 1989 and suggested repairs to salvage the "fallen pieces of masonry."

In late 2003 or early 2004, the Church secured the services of DPK&A architects to inspect the building. DPK&A work in conjunction with Partners for Sacred Places, a non-profit organization existing to preserve America's older religious properties. In its February 27, 2004 report, the DPK&A architects state that although they intended to review the entire building, they focused on the steeple. They state that "the general condition of the exterior building stone is in very poor state" and that the "stone at the tower is in a far worse condition." (GuideOne's Mot., at 10). Moreover, the report predicts that:

> at some point, the active stone loss and instability . . . will lead to the loss of an entire corner or pier and precipitate the catastrophic collapse of the tower. It is impossible to predict exactly when this will occur, but we believe that the evidence shows that the tower is well along the way in this process.

(Id.).

In mid-2004, DPK&A performed a more extensive survey of the steeple tower and produced a report in July 2004. The report stated that "there are now large, through-wall cracks in the tower . . ." and that "in essence, we believe the tower is undergoing an active and

accelerated process of implosion." (Church Parties' Summ. J. Mot. ("Church Parties' Mot."), Ex. H). As a result of this report, the Church erected fencing around the steeple, discontinued use of the building, and also engaged a committee to explore fund-raising activities to demolish a portion of the tower and restore it to a safe condition.

### B.      August 3, 2004

On August 3, 2004, the Church steeple collapsed. The parties disagree about the cause of its collapse. In short, the Church claims that a lightning strike caused the steeple to collapse, while GuideOne argues that the steeple collapsed on its own due to the Church's neglect.

According to the Church, the following events transpired on August 3, 2004:

On August 3, 2004, the City of Philadelphia experienced a severe thunderstorm and heavy winds. During the course of this thunderstorm, the steeple was struck by lightning. This strike was but one of thirty-five lightning strikes that were reported in the vicinity of the Church building.

William G. Meinel, the preliminary witness to the lightning that struck the steeple ("Mr. Meinel"), testified at his deposition that around 5:30 on the afternoon of August 3, 2004, he was driving his 2004 Toyota Sienna west on Market Street. At that time, he was forced to park because of the "very fierce storm happening at the time" and the "torrential downpour" that was occurring. In his words, at or around 5:30 that evening:

> I was sitting in the van waiting for the rain to let up, and as I was sitting there I was just watching the storm because it was pretty nasty. And then I saw a gigantic bolt of lightning fly out of the sky right onto the spire of the church and a huge thunder. . . . It looked like [it hit] the tip of the spire or . . . if was not the tip it was kind of like right there, pretty close to it. . . . It was bright. It was a loud clap. I was amazed it stayed up. Because . . . it was so loud, so hard, I thought it was just going to fall right there.

When asked at his deposition if he "actually [saw] the lightning bolt hit the church tower," he replied, "Yes, I did."

Justin Kaplan, who lives across the street from Christ Memorial ("Mr.

6

Kaplan"), testified at his deposition that at around 5:00 p.m., he was "drywalling the ceiling" in his house when the storm, which he described as "real fast and violent," blew through Philadelphia. In his words, "I was doing my thing, it was raining really hard. And then there was a lightning strike that hit the church." Although he "couldn't see the actual lightning strike the steeple," he drew this conclusion because he "could see the flash" of lightning and he was aware that the steeple was "quite a bit higher than anything else around in the surrounding neighborhood."

For his part, at the time of the storm, the Reverent Larry H. Falcon ("Reverend Falcon") was working at a thrift store up the street from the Church. According to him, there were "heavy, heavy thunderstorms . . . and the lightning bolts were loud and close" to Reverend Falcon's own church. Thereafter, Reverend Falcon returned home. A few hours later, in his words:

> [t]he house rumbled. It sounded like an earthquake. My whole
> house shook. It shook, really shook. And so I immediately opened
> the front door. And I looked down the street . . . [a]nd the dust was
> rolling towards my house. It was just reminiscent of 9/11 when
> you saw that thick dust, when it hit the bottom, just rolling
> forward. And I looked up but the dust hadn't gone up yet. So I
> saw instantly the tower was gone. Just gone. . . .

At or around 10:32 p.m., the steeple collapsed as a direct result of the lightning strike.

(Church Parties' Mot., at 7-9) (internal citations omitted).

GuideOne argues that Reverend Falcon's comments are inconsistent and unreliable. The insurance company points out that Reverend Falcon stated that his customers said they had heard lightning strike the steeple. However, according to GuideOne, Reverend Falcon could not identify the customers who reportedly heard lightning strike the steeple. GuideOne also hired a private investigator who could not locate anyone who may have seen lightning strike the steeple. The insurance company also points out that Reverend Falcon's statement indicates that he saw a "huge crack" on the west side of the steeple the day before the collapse.

GuideOne also disputes the veracity of Mr. Kaplan's statement. In his signed statement,

Mr. Kaplan stated he believed lightning hit the steeple between 5:00 and 5:30 p.m.  However, in a recorded statement on September 8, 2005, Mr. Kaplan stated he believed the steeple had been hit by lightning merely because the sound of the lightning seemed to come from across 43rd Street.  According to GuideOne, Mr. Kaplan conceded he could not actually see lightning strike the steeple.

### C.      The Expert Reports

The Church parties' expert, Vincent N. Campisi, P.E., Chief Engineer at Clough, Harbour & Associates, L.L.P., attempts to explain that, despite the five-hour delay between the lightning strike and the collapse, the collapse was caused by the lightning strike:

> The most probable cause of the failure of the tower was due to a progressive loss of interior support (the rubble wall) which commenced with the tower being struck by lightning at approximately 5:30 p.m. on August 3, 2004.  The lightning strike was witnessed and was described as being a "fat lightning bolt" that struck the tower at an elevation of approximately 50 feet.  Research conducted indicates that a condition known as Ohmic Heating occurs when a conductor of small cross section carrying lightning current is constrained to carry a substantial part of the lightning current, it is likely to fuse explosively, especially if situated in a confined space.  (Ref: National Lighting Safety Institute, Section 5.1.6, Effects of Lightning on Assets, Facilities and Structures.
>
> Masonry stone towers have historically been struck by lightning and have failed in a manner similar to the Christ Memorial Church Tower among these are the Medieval Venice Campanile and the crossing tower of the Cathedral at Chichester.  The failure of these towers is discussed by Jacques Heyman, Professor Emeritus Cambridge University in his text "The Stone Skeleton, Structural Engineering of Stone Masonry" . . . .  The failure occurs when narrow fissures i.e., cracks in the stone masonry become wet in thunderstorms and then become good conductors for the lightning.
>
> The lightning strikes which can be in excess of 30,000 amperes are confined to the space within the narrow crack and cause a sudden rise in temperature estimated at 50,000 degrees Fahrenheit.  The pressure generated in such cases causes an explosion which can and has severely demonstrated masonry structures.  The explosive force is often demonstrated in viewing trees which appear to be

blown apart when struck by lightning.  The same Ohmic heating occurs in the sap
channels of a tree when struck by lightning become superheated and being in a
confined space explode and rip the tree open.  In the case of the Christ Memorial
Church Tower, it is most probable that the initial lightning strike and subsequent
explosion started a progressive failure of the interior rubble wall which progressed
over the next several hours culminating in the collapse of the tower at
approximately 10:30 p.m. on August 3, 2004.

It is therefore my opinion based upon a reasonable degree of scientific evidence
and engineering certainty that the tower was stable under its own loading and also
was demonstrated by the structural calculation to be stable for wind loads ten
times in excess of those reported by the weather service in Philadelphia that day.
Therefore it is my conclusion that the collapse of the Tower of the Christ
Memorial Church was directly caused by the lightning strike.

(Church Parties' Ex. K).

GuideOne also retained its own structural engineering firm, The Kachele Group to

investigate the cause of the collapse of the steeple.  According to the Kachele Group's August 20,

2004 report, "the most likely one appears to be that the tower's structure [was in a] severely

weakened state due to a lack of maintenance."  (Church Parties' Ex. M at 5).  As to whether

lightning struck the steeple, the Kachele Group's report states, "[t]he collected lightning strike

data do not necessarily confirm that the tower sustained a direct lightning strike, however it

cannot be ruled out."  (Id. at 4).  The Kachele Group's report also discusses the Church parties'

expert's explanation for the five hour delay between the lightning strike and the collapse of the

steeple:

Direct lightning strikes can cause structural damage to masonry structures by a
behavior know[n] as Ohmic Heating and Exploding Arc, where moisture and or
air trapped in confined spaces can heat rapidly causing a powerful explosive
event.  These types of events are typically fast and catastrophic.  Given that the
last recorded lightning strike was more than 4½  hours prior to the collapse it is

highly unlikely such a catastrophic event occurred.[4]

(Id.).

### D.      The Policy & GuideOne's Denial of Coverage

Within days of August 3, 2004, the Church parties made a claim with GuideOne for the

damage caused by the steeple's collapse.  Essentially, the insurance policy between the parties

covered collapse resulting from lightning, but excluded collapse due to wear or neglect.

The policy issued to the Church provides basic insuring language of the Building and

Personal Property Coverage Form stating, "we will pay for direct physical loss of or damage to

Covered Property at the premises described in the Declarations caused by or resulting from any

Covered Cause of Loss." (Church Parties' Mot., Ex. J).  The "Cause of Loss - Special Form"

specifies that a "covered cause of loss" is a risk of direct loss unless the loss is excluded or

limited.  (Id.).  Exclusion B.2 states that:

> We will not pay for loss or damage caused by or resulting from any of the
> following:
>
> d.      (1)    Wear and tear;
>         (2)    . . . decay, deterioration . . . or any quality in
>                property that causes it to damage or destroy itself;
>
> f.      Continuous or repeated seepage or leakage of water that
>         occurs over a period of 14 days or more. . . .
>
> k.      Collapse, except as provided below in the Additional
>         Coverage for Collapse.  But if collapse results in a Covered
>         Cause of Loss at the described premises, we will pay for the
>         loss or damage caused by that covered cause of Loss.

---

[4]  The Church parties moved to strike this statement for being "subjective belief or unsupported speculation" as defined by Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).  Although I denied the Church parties' motion to strike without prejudice, a triable issue of fact remains even if the statements in the August 20, 2004 Kachele Group report were stricken.

(<u>Id.</u>).  Exclusion B.3 states:

> We will not pay for loss or damage caused by or resulting from any of the
> following, 3.a through 3.c.  But if an excluded cause of loss that is listed in 3.a
> through 3.c results in a Covered Cause of Loss, we will pay for the loss or damage
> by the Covered Cause of Loss.
>
>> b.      Acts or decisions, including the failure to act or decide, or
>>         any person, group, organization or governmental body.
>>
>> c.      Faulty, inadequate, or defective:
>>         (2)      . . . repair, . . . ;
>>         (4)      Maintenance;
>>         of part or all of any property on or off the described
>>         premises.

(<u>Id.</u>).  The Additional Coverage for Collapse states that, "[w]e will pay for direct physical loss or

damage to Covered Property, caused by collapse of a building insured under this Coverage Form,

if the collapse is caused by one or more of the following: . . . lightning."  (<u>Id.</u>).

On September 27, 2004, GuideOne denied the Church's insurance claim.  Based upon the

reports from DPK&A and the Kachele Group, GuideOne concluded that the steeple "collapsed"

as the result of "wear and tear," "decay," and "deterioration."  GuideOne also rejected the

church's theory that the steeple collapsed as a result of lightning due to what it perceived as a

lack of credible witness statements or physical evidence suggesting a lightning strike.  In the

denial letter, the Property Manager, David Hanson, explained the denial as follows:

> The collapse of a building is not a Covered Cause of Loss under the policy unless
> the collapse resulted from lightning.  GuideOne has identified no reliable support
> for the assumption made by Mr. Kaplin that the steeple was struck by lightning,
> and experience suggests that, if a lightning strike is serious enough to cause a
> building to collapse, that collapse is immediate and catastrophic.  Here, the
> lightning preceded the collapse by five or more hours.
>
> Not only is collapse explicitly excluded from Covered Causes of Loss under this
> policy, but so are "wear and tear," "decay," and "deterioration."  Those are terms

used or implied in the DPK&A and Kachele Group reports to describe the steeple's condition.  Likewise, if the constant effects of rain contributed to weakening the structure of the steeple, such "continuous or repeated seepage or leakage of water" is not a Covered Cause of Loss.

Thus, GuideOne is compelled by the facts and the policy terms to deny coverage for this claim and all related losses because this claim does not involve a Covered Cause of Loss.

In addition, I must also reserve GuideOne's rights under the policy and the law to deny coverage for this claims and all related losses on different or additional grounds as further investigation might establish, including without limitation the failure of the Diocese to act promptly to stabilize the steeple to prevent a collapse and/or prior fault, inadequate or defective repair or maintenance.

Nevertheless, I repeat my invitation that you discuss with me the possibility of our reaching some accommodation of your claim without GuideOne's acknowledging coverage that it believes in good faith does not exist here.

(Church Parties' Mot. Ex. I).  Underscoring the importance of the coverage terms, at his deposition, Mr. Hansen stated that irrespective of the Church's condition at the time of the lightning strike, if the collapse was caused by the lightning strike, the Church would be covered. (Church Parties' Mot. Ex. G).

### E.      Procedural History

On July 29, 2005, the Church parties filed a Complaint against GuideOne for coverage. In October 2005, counsel for the Church parties informed counsel for GuideOne that the Church had located a witness, Mr. Meinel, who would testify that he actually saw lightning strike the steeple on the date of the storm.  The parties deposed Mr. Meinel on October 31, 2005.  On December 1, 2005, after reviewing the steeple's history and Mr. Meinel's deposition testimony, the Kachele Group supplemented its August 20, 2004 report, stating, "[r]eviewing the reports produced since 1983, gave me greater appreciation into the severely poor condition of the steeple

structure before its collapse. [M]y opinion regarding the cause and origin of the collapse remains as given in THE KACHELE GROUP'S report August 20, 2004." (Church Parties' Ex. N).

On February 2, 2006, GuideOne filed its Motions for Summary Judgment. On February 10, 2006, the Church parties filed their response and Cross-Motion for Summary Judgment.

## II.      STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson, 477 U.S. at 249. A factual dispute is material only if it might affect the outcome of the suit under governing law. Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)(citing Celotex, 477 U.S. at  325 (1986)). Further, the non-moving party has the burden of

producing evidence to establish prima facie each element of its claim.  Celotex, 477 U.S. at

322-23.  If the court, in viewing all reasonable inferences in favor of the non-moving party,

determines that there is no genuine issue of material fact, then summary judgment is proper.  Id.

at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

Here, both parties have filed motions for summary judgment.  Cross-motions are merely

claims by each side that it alone is entitled to summary judgment.  They do not constitute an

agreement that if one is denied the other is necessarily granted, or that the losing party waives

judicial consideration and determination of whether genuine issues of material fact exist.  Rains

v. Cascade Industries, Inc., 402 F.2d 241, 245 (3d Cir. 1968).  If any such issue exists, then it

must be disposed of at trial and not on summary judgment.  Id.

## III.   DISCUSSION

Neither GuideOne nor the Church parties are entitled to summary judgment because there

are genuine issues of material fact that a jury must decide.  Simply put, there is a triable issue of

fact as to whether lightning caused the steeple's collapse or whether the steeple collapsed due to

neglect.  Both parties appear to agree that the insurance policy clearly covers damage resulting

from lightning, but not collapse due to lack of maintenance.  (Church Parties' Mot. Ex. J).  The

Property Manager who denied the Church's insurance claim, David Hansen, described the terms

of the insurance policy at his deposition by stating that irrespective of the Church's condition at

the time of the lightning strike, if the collapse was caused by the lightning strike, the Church

would be covered.  (Church Parties' Mot. Ex. G).

However, both parties disagree about whether lightning was, in fact, the cause of the

steeple's collapse.  Both parties support their arguments by presenting evidence of a factual

dispute that must be decided by a jury and not by relying on the pleadings or unsupported

allegations.  Williams, 891 F.2d at 460 (citing Celotex, 477 U.S. at 325 (1986)).   As a

preliminary matter, the parties disagree about whether lightning struck the steeple.  The Church

parties argue that lightning struck the Church's steeple at around 5:30 p.m. on August 3, 2004.

They cite Mr. Meinel's deposition testimony that he "saw a gigantic bolt of lightning fly out of

the sky right onto the spire of the church" and that he "actually [saw] the lightning bolt hit the

church tower."  (Church Parties' Mot. Ex. D, at 7, 9, 11).  The Church parties also point to Mr.

Kaplan's deposition testimony in which he concludes that the lightning struck the steeple because

he "could see the flash" of lightning during the storm and he knew that the steeple was "quite a

bit higher than anything else around in the surrounding neighborhood."  (Church Parties' Mot.

Ex. E, at 20).

Meanwhile, GuideOne argues that there is insufficient evidence to find that lightning

actually struck the steeple.  According to the insurance company, the private investigator they

hired did not find anyone who saw lightning strike the steeple.  Although GuideOne concedes

that Mr. Meinel's testimony supports the Church parties' argument, it notes that none of the other

Church parties' witnesses actually saw lightning strike the steeple.  Instead, GuideOne argues

that lightning had nothing to do with the steeple's collapse.  The dispute between the parties

suggests a material issue of fact as to whether lightning struck the steeple on August 3, 2004.

Even if lightning struck the steeple, there is a material issue of fact as to whether

lightning was the cause of the steeple's collapse.  The Church parties argue that the lightning

strike caused the steeple's collapse despite the approximate five hour gap between the alleged

lightning strike at 5:30 p.m. and the collapse at 10:30 p.m..  To support this argument, the

Church parties rely on the opinion of their expert, Vincent N. Campisi ("Mr. Campisi").  Mr. Campisi determined that "the collapse of the Tower of the Christ Memorial Church was directly caused by the lightning strike," with "the initial lightning strike and subsequent explosion start[ing] a progressive failure of the interior rubble wall which progressed over the next several hours culminating in the collapse of the steeple at approximately 10:30 p.m. on August 3, 2004." (Church Parties' Mot. Ex. K, at 4).  The lightning combined with the Ohmic Heating of the Church's interior, argues the Church parties, caused the steeple to crumble.

GuideOne argues the collapse was not caused by lightning, but by neglect, wear, and deterioration.  GuideOne cites the history of reports dating back to 1983.  Each report cites the need for structural repairs.  In 1989, the Ortega Engineers report noted "active deterioration process" and "several features of the building which have the potential for catastrophic failure." (GuideOne's Mot., at 15).  In February 27, 2004, the DPK&A report predicted that:

> at some point, the active stone loss and instability . . . will lead to the loss of an entire corner or pier and precipitate the catastrophic collapse of the tower.  It is impossible to predict exactly when this will occur, but we believe that the evidence shows that the tower is well along the way in this process.

(GuideOne's Mot., at 10).  DPK&A then performed a more extensive survey later in 2004.  In its July 2004 report, DPK&A stated that "there are now large, through-wall cracks in the tower . . ." and that "in essence, we believe the tower is undergoing an active and accelerated process of implosion." (Church Parties' Ex. H).

After the collapse, GuideOne's experts, the Kachele Group, surmised in its August 20, 2004 report that the most likely cause for the collapse was that the tower's structure was in a "severely weakened state due to a lack of maintenance." (Church Parties' Ex. M at 5).

Additionally, the Kachele Group's report also considered, but rejected Mr. Campisi's Ohmic heating of the Church's interior explanation for the steeple's collapse.  Therefore, GuideOne argues that the steeple's deteriorated condition was the cause of the collapse.

The parties' evidence supporting this disagreement precludes me from granting motion for summary judgment. The issues of whether the steeple was struck by lightning and whether the lightning strike caused the steeple to collapse are factual disputes that must be decided by the jury.[5]  Therefore, I will deny the parties' Motions for Summary Judgment.

An appropriate order follows.

---

[5]  Additionally, GuideOne argues that the "known-loss doctrine" and the "non-fortuitous loss doctrine" guarantee summary judgment in its favor.  These two doctrines are two sides of the same coin and neither has merit here.  The "known-loss doctrine" states that "one may not obtain insurance for a loss that either has already taken place or is in progress." Rohm and Haas Co. v. Continental Cas. Co., 781 A.2d 1172, 1176 (Pa. 2001).  GuideOne argues that because the Church parties knew the church needed to be repaired and was in the process of collapsing, they could not insure against its collapse.  However, viewing all the facts in favor of the Church parties, lightning caused the steeple's collapse and the collapse was not inevitable.  By the terms of the policy, GuideOne accepted the risk that the steeple would collapse due to a lightning strike regardless of the steeple's condition at the time of the strike.  The "known-loss doctrine" is inapplicable because, although the Church parties admit the steeple needed to be restored, the Church parties could not have foreseen that the steeple would be collapse as a result of being struck by lightning.  In short, there was no "known-loss."

Like the "known-loss doctrine," the "non-fortuitous loss doctrine" provides that it is contrary to public policy to permit the enforcement of an insurance contract "if it would provide indemnification for losses that are not fortuitous." Koppers Co., Inc. v. Aetna Cas. and Sur. Co., 98 F.3d 1440, 1447 (3d Cir. 1996).  GuideOne chooses to define a "fortuitous event" as "an event which so far as the parties to the contract are aware, is dependent on chance. . . . provided that the fact is unknown to the parties." (GuideOne Mot., at 23 (quoting Restatement of Contracts § 691 comment a.)).  Once again GuideOne argues that the Church parties were aware of the serious problems with the Church and were equally aware that the collapse of the steeple was inevitable.  The "non-fortuitous loss doctrine" is equally inapplicable because the fact that lightning would strike the steeple was dependent on chance and not known to the Church parties.  Furthermore, viewing the facts in a light most favorable to the Church parties, the collapse of the steeple was not inevitable before it was struck by lightning.  As such, I cannot find that the Church parties attempted to insure against a non-fortuitous event.  Therefore, the "known-loss doctrine" and the "non-fortuitous loss doctrine" are of no help to GuideOne's Motions for Summary Judgment.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| GUIDEONE ELITE INSURANCE COMPANY, : | CIVIL ACTION |
| : | |
| Plaintiff, : | |
| : | |
| v. : | No. 05-4162 |
| : | |
| DIOCESE OF THE NORTHEAST AND MID-ATLANTIC: | |
| OF THE REFORMED EPISCOPAL CHURCH, : | |
| : | |
| Defendant. : | |
| : | |
| : | |
| CHRIST MEMORIAL REFORMED EPISCOPAL : | CIVIL ACTION |
| CHURCH and TRUSTEES OF THE SUSTENATION : | |
| FUND OF THE GENERAL COUNCIL OF THE : | |
| REFORMED CHURCH, : | |
| Plaintiff, : | |
| : | |
| v. : | No. 05-4321 |
| : | |
| GUIDEONE ELITE INSURANCE COMPANY, : | |
| : | |
| Defendant. : | |
| : | |

## O R D E R

   **AND NOW** this  23rd day of March, 2006, upon consideration of "GuideOne's Motions

for Summary Judgment" (05-cv-4321, Doc. No. 7; 05-cv-4162, Doc. No. 17) and the "Church

Parties Cross-Motion for Summary Judgment" (05-cv-4162, Doc. No. 20), and all responses

thereto, it is hereby **ORDERED** that the above-captioned parties' Motions for Summary

Judgment are **DENIED**.

                                                            BY THE COURT:


                                                             /s/ Robert F. Kelly
                                                            ROBERT F. KELLY,          Sr. J.